**Patrick FITZGERALD, et al., Plaintiffs,**

v.

**Robert CASSIL, et al., Defendants.**

No. C–02–3857 EMC.

United States District Court,
N.D. California.

July 31, 2003.

Christopher Brancart, Liza Cristol–Deman, Brancart & Brancart, Pescadero, CA, for Plaintiffs.

Michael T. Kennick, King & Kennick LLP, Huntington Beach, CA, for Defendants.

## ORDER GRANTING PLAINTIFFS' MOTION TO QUASH SUBPOENAS SEEKING PLAINTIFFS' MEDICAL AND PSYCHOTHERAPY RECORDS (Docket No. 32)

CHEN, United States Magistrate Judge.

Plaintiffs Patrick Fitzgerald, Daniel Yu, and their adopted son, Declan Fitzgerald–Yu (collectively "Plaintiffs") filed suit against Robert Cassil, Hawthorne/Stone Real Estate Investments, Inc., and Donald Simmons (collectively "Defendants") for, *inter alia*, violation of the Fair Housing Act, 42 U.S.C. § 3604, and various state laws. Plaintiffs allege that Defendants have discriminated against them on the basis of familial status. In their complaint, Plaintiffs claim that Mr. Fitzgerald and Mr. Yu suffered emotional distress and attendant bodily injury as a result of Defendants' conduct. Defendants subsequently subpoenaed the medical and psychological records of Mr. Fitzgerald and Mr. Yu. Plaintiffs now move to quash the subpoenas, issued to Maggie Hochfelder, M.F.T.; Christa Donaldson, M.F.T.; Thomas Caldarola, M.F.C.C.; and California Pacific Medical Center.

Having reviewed the briefs, the accompanying submissions, and the record in this case, and having considered the oral argument of counsel on July 16, 2003, and good cause appearing therefor, the Court hereby GRANTS Plaintiffs' motion to quash the subpoenas.

## I. FACTUAL BACKGROUND

Mr. Fitzgerald and Mr. Yu, along with their adopted son Declan, live at the Gaiser Court Apartments ("Apartments") in San Francisco, which are owned and/or managed by Defendants. In their complaint, Plaintiffs allege the following facts: Mr. Fitzgerald and Mr. Yu informed Mr. Simmons, the resident manager of the Apartments, that they were going to adopt a son. Mr. Simmons stated that he did not want children in the complex. Declan's adoption was finalized in December 2000, at which time he was approximately five months old. After Declan moved in, Mr. Simmons made several comments about how Plaintiffs should move out of the Apartments because of Declan. Mr. Simmons also said that he did not want Declan to play in the courtyard of the Apartments. In March 2002, there were three incidents during which Mr. Simmons expressed his hostility toward Plaintiffs. All three incidents involved Declan's riding, pushing, or carrying a plastic toy car in the courtyard with Mr. Fitzgerald and/or Mr. Yu. All three incidents involved Mr. Simmons yelling at Declan, Mr. Fitzgerald, and/or Mr. Yu. On the third occasion, Mr. Simmons used profanity in Declan's presence.

In Plaintiffs' complaint, Mr. Fitzgerald and Mr. Yu claimed emotional distress and attendant bodily injury, including headaches and sleep loss, as a result of these events. Plaintiffs expanded on the emotional distress in their initial disclosures, which were incorporated into their interrogatory responses. *See* Kreps Decl., Exs. C–D (interrogatory responses of Mr. Fitzgerald and Mr. Yu, respectively). More specifically, Plaintiffs stated that the emotional distress damages of Mr. Fitzgerald were: depression, anger/irritability, discouragement, nervousness, sleep loss, withdrawal, relived experience, and low self-esteem. *See id.*, Ex. B (Plaintiffs' initial disclosures). Plaintiffs stated that the emotional distress damages of Mr. Yu were: anger/irritability, discouragement, nervousness, sleep loss, relived experience, and arguing with his partner. *See id.*

Subsequently, Defendants sought to depose both Mr. Fitzgerald and Mr. Yu. At the depositions, Mr. Fitzgerald and Mr. Yu testified about the emotional distress they experienced as a result of the encounters with Mr. Simmons. *See* Cristol–Deman Decl., Exs. 1–2 (depositions of Mr. Fitzgerald and Mr. Yu, respectively). Defendants then served four subpoenas on the medical providers and psychotherapists identified by Mr. Fitzgerald and Mr. Yu during the depositions. The subpoenas sought the following documents:

> "Any and all medical records, including prescriptions, diagnosis, treatment, notes, correspondence, and billing, for any and all medical and/or mental health services provided, including but not limited to psychiatric, psychological, counseling, and group therapy pertaining to the plaintiff [Mr. Fitzgerald and/or Mr. Yu] from first date to and including the present."

Mot. at 1 (quoting subpoenas). Plaintiffs now move to quash the subpoenas, asserting that they are not relevant and that they are privileged.

## II. *DISCUSSION*

Plaintiffs argue that the subpoenas should be quashed because: (1) the medical and psychological records of Mr. Fitzgerald and Mr. Yu are not relevant, (2) the records are protected by the psychotherapist-patient privilege, which has not been waived, (3) the records are protected by the right to privacy, and (4) the records should be protected as a matter of policy or else civil rights litigants will be dissuaded from bringing claims. In response, Defendants contend that: (1) Plaintiffs waived the psychotherapist-patient privilege by claiming emotional distress damages and special damages in their complaint, (2) Plaintiffs have alleged not only a violation of their civil rights but also state law violations such as negligence for which special damages may be awarded, and (3) Defendants will be prejudiced without the discovery because the records may reveal other causes for the emotional distress and inform the magnitude of the distress, if any, attributable to Defendants.

### A. *Relevance*

As a preliminary matter, the Court notes that there are two types of records at issue: medical and psychological. To the extent any medical records involve mental health (including physical conditions tied to mental health), they are considered psychological records for purposes of this motion. All other medical records are "pure" medical records. In the subpoenas, Defendants sought both psychological and pure medical records.

■ Plaintiffs argue that neither the psychological records of Mr. Fitzgerald and Mr. Yu nor the pure medical records are relevant. The Court agrees that the pure medical records are not relevant because Mr. Fitzgerald and Mr. Yu have not made any claim for bodily injury other than that directly and immediately linked to emotional distress. Plaintiffs do not claim that Mr. Fitzgerald and Mr. Yu received any medical treatment for any purely physical injury or disorder. As Defendants conceded at oral argument, Mr. Fitzgerald and Mr. Yu have not put their physical conditions (as revealed in the pure medical records) at issue in this suit.

■ However, the Court finds that the psychological records are relevant. Federal Rule of Civil Procedure 26(b)(1) provides a broad definition of relevance for purposes of discovery: "Parties may obtain discovery regarding any matter, not privileged that is relevant to the claim or defense of any party.... Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1); *see also* Wright, Miller & Marcus, Federal Practice & Procedure § 2008 (noting that, even after 2000 amendment to Rule 26(b)(1), standard "is still a very broad one"). The psychological records are relevant in determining, among other things, causation for (*i.e.,* whether there were other unrelated sources for Mr. Fitzgerald and Mr. Yu's emotional distress) or the magnitude of the alleged distress.

## B.  *Psychotherapist–Patient Privilege*

### 1.  *Applicable Law*

■  Because the psychological records are relevant, the question is whether they are protected by the psychotherapist-patient privilege and thus exempt from discovery. To answer this question, the Court must first determine whether the federal law of privilege or the state law of privilege should apply given that Plaintiffs have alleged both federal claims and state claims.

> In cases involving both state and federal claims, a literal reading of [Federal Rule of Evidence] 501 appears to require application of the federal common law of privileges with respect to the federal claims and the state law of privileges with respect to the state claims.  However, when the evidence in question is relevant to *both* the state and federal claims, the approach has been rejected on the grounds that it would be meaningless to hold the same communication privileged for one set of claims but not for the other.

6–26 Moore's Fed. Practice—Civil § 26.47[4] (emphasis added).  In such cases, the federal law of privilege applies to both the state and federal claims.  *See id.; see also Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455, 459 (N.D.Cal.1978) (concluding that "in federal question cases where pendent state claims are raised the federal common law of privileges should govern all claims of privilege raised in the litigation," at least where information sought goes to both federal and state claims).

In this case, the evidence in question—*i.e.*, the psychological records—is relevant to both the state and federal claims.  Both are related to the same nucleus of operative facts.  Therefore, the federal law of privilege should apply.

### 2.  *Jaffee v. Redmond*

In *Jaffee v. Redmond*, 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996), the Supreme Court found that, under Rule 501, there exists a psychotherapist-patient privilege under the federal common law.  *See id.* at 15, 116 S.Ct. 1923.  The Court observed that, "[l]ike the spousal and attorney-client privileges, the

psychotherapist-patient privilege is rooted in the imperative need for confidence and trust."  *Id.* at 10, 116 S.Ct. 1923 (citation omitted).  The Court further noted:

> The psychotherapist privilege serves the public interest by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem.  The mental health of our citizenry, no less than its physical health, is a public good of transcendent importance.

*Id.* at 11, 116 S.Ct. 1923.  Because the privilege will serve a

> public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth, we hold that confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence.

*Id.* at 15, 116 S.Ct. 1923 (citation omitted).

The Supreme Court noted that the psychotherapist-patient privilege could be waived, *see id.* at 15 n. 14, 116 S.Ct. 1923, but did not discuss what exactly would constitute a waiver.  Importantly, however, it rejected the "balancing" approach taken by some federal and state courts to determine the applicability of the privilege.  It stated:

> Making the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege. . . . [I]f the purpose of the privilege is to be served, the participants in the confidential conversation "must be able to predict with some degree of certainty whether particular discussions will be protected.  An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all."

*Id.* at 17–18, 116 S.Ct. 1923.  The Court concluded that the privilege applied to communications the defendant had in the course of psychotherapeutic counseling with a social worker.

### 3. *Broad v. Narrow Approach to Waiver*

The parties do not dispute that the psychological records fall under the psychotherapist-patient privilege set out in *Jaffee*. What they dispute is whether Plaintiffs have waived the privilege in bringing this suit seeking recovery for emotional distress and related physical manifestations.

■ The burden of demonstrating that there has been no waiver falls on Plaintiffs. In *Jaffee*, the Supreme Court repeatedly analogized the psychotherapist-patient privilege to the attorney-client privilege. There is good reason, therefore, to treat the two privileges similarly, at least for this procedural purpose. In the context of the attorney-client privilege, nonwaiver must be proved by the party asserting the privilege. *See, e.g., United States v. Martin*, 278 F.3d 988, 999–1000 (9th Cir.2002) (noting that burden is on party asserting attorney-client privilege to establish all elements of privilege, which includes no waiver).

Before determining whether Plaintiffs can meet the burden of proving no waiver, the Court notes that the following stipulations were made by Plaintiffs at the hearing on the motion to quash: (1) Mr. Fitzgerald and Mr. Yu will not testify that they sought or obtained psychological treatment for the emotional distress suffered as a result of Defendants' conduct and (2) Plaintiffs will not rely on the testimony of a treating psychotherapist or any other expert to establish the emotional distress suffered by Mr. Fitzgerald and Mr. Yu. The Court also takes note that in their motion to quash Plaintiffs stated as follows: (3) "Plaintiffs do not allege that the discrimination by [D]efendants caused any specific disabilities or mental or medical abnormalities;" and (4) "Plaintiffs will not claim that they had any pre-existing conditions that were exacerbated by [D]efendants' discrimination." Mot. at 5. In light of these stipulations and statements, the question is whether there has been a waiver of the psychotherapist-patient privilege simply because Plaintiffs claimed emotional distress in their complaint and described what some courts

have termed "garden-variety" emotional distress in their initial disclosures, interrogatory responses, and deposition testimony.

■ There is no direct Ninth Circuit authority or prior decisions of this Court on this issue, and the courts who have addressed the issue have not come to any consensus. *See generally* Note, *Certainty Thwarted: Broad Waiver Versus Narrow Waiver of the Psychotherapist–Patient Privilege After Jaffee v. Redmond*, 52 Hastings L.J. 1369 (2001) (discussing various cases). On the one end of the spectrum there is the broad approach to waiver. Under the broad approach, courts have held that a simple allegation of emotional distress in a complaint constitutes waiver. *See Sarko v. Penn–Del Directory Co.*, 170 F.R.D. 127 (E.D.Penn.1997); *Doe v. City of Chula Vista*, 196 F.R.D. 562 (S.D.Cal.1999). Under the narrow approach, at the other end of the spectrum, courts have held that there must be an affirmative reliance on the psychotherapist-patient communications before the privilege will be deemed waived. *See Vanderbilt v. Town of Chilmark*, 174 F.R.D. 225 (D.Mass.1997); *Hucko v. City of Oak Forest*, 185 F.R.D. 526 (N.D.Ill.1999).[1]

The rationale behind the *Sarko* line of cases is generally based on fairness considerations. *See, e.g., Doe*, 196 F.R.D. at 566, 569. That is, if a plaintiff claims emotional distress, then a defendant needs to be able to challenge that claim thoroughly; psychological records can illuminate, for instance, whether there are sources of the emotional distress other than the defendant's conduct.

The theory behind the *Vanderbilt* line of cases is generally based upon the primacy of the privacy interests inherent in the privilege and *Jaffee's* rejection of the balancing approach. As explained by the *Vanderbilt* court:

> *Jaffee's* "no balancing" instruction drastically changes the waiver formula.... After *Jaffee*, a court cannot force disclosure of [psychotherapist-patient] communications solely because it may be extremely useful

---

1. For a discussion of the broad and the narrow approaches to waiver, see *Certainty Thwarted*,

*supra*, at 1375–76.

to the finder of fact. Giving weight to the usefulness of the evidence as a factor in a decision regarding the scope of the privilege would be a balancing exercise that was barred by *Jaffee.*

*Vanderbilt,* 174 F.R.D. at 229; *see also Certainty Thwarted, supra,* at 1386. The broader measure of fairness underpinning *Sarko* and the broad waiver approach would render the psychotherapist-patient privilege pointless: "[T]he very nature of a privilege is that it prevents disclosure of information that may be relevant in the case, in order to serve interests that are of over-arching importance." *Hucko,* 185 F.R.D. at 530.

In addition, the *Vanderbilt* line of cases relies upon an analogy to the attorney-client privilege which is waived when the client affirmatively relies on attorney-client communications to further her own claim. *See Vanderbilt,* 174 F.R.D. at 229. For example, in the patent context, a

> defendant who denies willful infringement, and asserts as an affirmative defense that he acted in good faith, does not automatically waive the privilege as to any communications he may have had with counsel regarding the alleged infringement. It is only when the defendant, as part of the defense, specifically asserts the advice of counsel as a basis of that good faith defense that the privilege is waived.

*Hucko,* 185 F.R.D. at 530. Thus, as with the case of waiver of the attorney-client privilege, there may be a waiver of the psychotherapist-patient privilege if the communication between the two is put at issue by the patient, for example, where the cause of action relies on advice or findings of the psychotherapist. *See Vanderbilt,* 174 F.R.D. at 229. Under this measure of fairness, waiver prevents the privilege from being used as both a shield and a sword. *See id.* at 229–30.

#### 4. *Middle Ground Approach to Waiver*

There is a middle ground between the *Sarko* and *Vanderbilt* lines of cases. *See* 3–504 Weinstein's Federal Evidence § 504.07[8] & n. 22.4 (discussing "limited" broad view of waiver). Under this approach, courts have generally found a waiver when the plaintiff has done more than allege "garden-variety" emotional distress. Garden-variety emotional distress has been described by one court as "ordinary or commonplace emotional distress," that which is "simple or usual." In contrast, emotional distress that is not garden variety "may be complex, such as that resulting in a specific psychiatric disorder." *Ruhlmann v. Ulster County Dep't of Soc. Servs.,* 194 F.R.D. 445, 449 n. 6 (N.D.N.Y.2000). In *Ruhlmann,* the court concluded that the plaintiff did not waive the psychotherapist-patient privilege by seeking such garden-variety or "incidental emotional distress damages." *Id.* at 450. Similarly, in *Santelli v. Electro–Motive,* 188 F.R.D. 306 (N.D.Ill.1999), the court held that the plaintiff avoided waiver of the privilege by limiting the compensation she sought to humiliation, embarrassment, anger, and other similar emotions. *See id.* at 309.

In *Jackson v. Chubb Corp.,* 193 F.R.D. 216 (D.N.J.2000), the court similarly held that, if a plaintiff merely alleged garden-variety emotional distress—and not "a separate tort for the distress, any specific psychiatric injury or disorder, or unusually severe distress"—she did not waive the psychotherapist-patient privilege. *Id.* at 226. The *Jackson* court arrived at this conclusion by analogizing to case law applying Federal Rule of Civil Procedure 35(a) which governs court orders for physical or mental examinations when a party's physical or mental condition is "in controversy." Fed.R.Civ.P. 35(a). The court noted that, under the Rule 35(a), a plaintiff's mental condition was not in controversy simply because she alleged garden-variety emotional distress. Rather, something more was required. *See Jackson,* 193 F.R.D. at 226. The courts interpreting Rule 35(a) have required that:

> (1) the plaintiff has pled a cause of action for intentional or negligent infliction of emotional distress; (2) the plaintiff has alleged a specific mental or psychiatric injury; (3) the plaintiff has pled a claim for unusually severe emotional distress; (4) the plaintiff plans to offer expert testimony to support a claim of emotional distress; and/or (5) the plaintiff has conceded that

his or her mental condition is "in controversy" for purposes of [Rule] 35(a).

*Ford v. Contra Costa County,* 179 F.R.D. 579, 579 (N.D.Cal.1998) (considering whether examination warranted under Rule 35(a); relying on *Turner v. Imperial Stores,* 161 F.R.D. 89, 92–97 (S.D.Cal.1995)).[2]

### 5. *Adopting Narrow Approach to Waiver*

Having given due consideration to both the *Sarko* and *Vanderbilt* line of cases, the Court declines to follow the broad approach. It is persuaded that the *Vanderbilt* line of cases is more consistent with *Jaffee,* which "drastically change[d] the waiver formula" and emphatically rejected a balancing of the patient's interest in privacy against the need for the psychotherapist-patient communications by the party seeking discovery. *Vanderbilt,* 174 F.R.D. at 229 ("Giving weight to the usefulness of the evidence as a factor in a decision regarding the scope of the privilege would be a balancing exercise that was barred by *Jaffee.*"). Moreover, the potential for abuse under the broad waiver approach is substantial. *Cf. Burrell v. Crown Cent. Petroleum,* 177 F.R.D. 376, 383 (E.D.Tex.1997) (taking note in context of Rule 26 of "tremendous potential for abuse that exists when a defendant has unfettered access to a plaintiff's medical records"); *Smith v. J.I. Case Corp.,* 163 F.R.D. 229, 232 (E.D.Penn.1995) (taking note of same in context of Rule 35).

The Court notes that broad approach to waiver in *Sarko* is not necessary to achieve basic fairness to the defendant. While the privilege may bar access to medical records, the defendant may cross-examine the plaintiff, as was done in the instant case, about other stressors or contributing factors that may explain or have contributed to the alleged emotional distress. The occurrence and dates of any psychotherapy including that which occurred before the incident is not privileged and subject to discovery. *See Vanderbilt,* 174 F.R.D. at 230. The defendant can examine percipient witnesses or find other evidence to show, for example, that plaintiff's description of his or her distress is exaggerated. It may elicit from the plaintiff the fact that the plaintiff did not seek and obtain treatment or therapy for the alleged distress. These examples illustrate that the defendant has numerous avenues through which it can make its case without delving into the plaintiff's confidential communication with his or her therapist. *Cf. Doubleday v. Ruh,* 149 F.R.D. 601, 607 (E.D.Cal.1993) (noting that, to overcome qualified work product privilege, party must demonstrate "a 'substantial need' for the qualified work product, as well as an inability to obtain the information from other sources without undue hardship"); Fed.R.Civ.P. 26(b)(3) (providing for qualified work product privilege). Finally, the defendant benefits by the guarantee that the plaintiff will not present expert evidence at trial.

The Court also rejects the middle ground approach that employs the garden-variety test imported from Rule 35. The middle ground approach is not sufficiently protective of the psychotherapist-patient privilege established in *Jaffee.* While a Rule 35(a) examination may compromise a litigant's privacy, waiver of the psychotherapist-patient privilege entails more than an invasion of privacy; it threatens access to treatment by breaking the "imperative need for confidence

---

**2.** There is reason for analogizing the waiver analysis of the psychotherapist-patient privilege to Rule 35(a) examinations—both involve invasion into sensitive privacy interest—and it cannot be said *a priori* that turning over one's psychological records is more or less invasive than requiring one to submit to a Rule 35 examination. Arguably, Rule 35(a) is more invasive because it requires a party to submit involuntarily to a potentially open-ended examination by a medical expert designated by the opposing party. However, one judge has rejected this view, holding that it was more invasive for there to be a waiver as opposed to an involuntary examina-

tion: "Many, if not most, people would undoubtedly prefer to submit to a mental examination, in which they have a degree of control over what information is revealed, than to have the records of their past psychotherapy sessions disclosed to their adversaries in litigation." *Fritsch v. City of Chula Vista,* 187 F.R.D. 614, 632 (S.D.Cal.) (concluding that, "in establishing an evidentiary privilege for psychotherapist-patient records, the *Jaffee* court set a *higher* standard than Rule 35(a)'s 'in controversy' requirement") (emphasis in original), *overruled,* 196 F.R.D. 562 (S.D.Cal.1999) (holding broad waiver rule applies).

and trust" upon which psychotherapy is rooted. *Jaffee*, 518 U.S. at 10, 116 S.Ct. 1923.

Furthermore, the use of a test for waiver that hinges on an after-the-fact judicial assessment of numerous qualitative factors introduces a risk of uncertainty that the Supreme Court in *Jaffee* sought to avoid. In *McKenna v. Cruz*, No. 98 Civ. 1853(HB)(HBP), 1998 WL 809533, 1998 U.S. Dist. LEXIS 18293 (S.D.N.Y.1998), the court criticized the middle ground approach precisely because "[e]ndorsement of a rule under which the validity of an assertion of privilege would turn on the basis of an undefined term [*i.e.*, garden variety] would reintroduce the very uncertainty the Supreme Court eliminated when it endorsed the psychotherapist-patient privilege as an unconditional privilege." *Id.*, 1998 WL 809533, at *2, 1998 U.S. Dist. LEXIS 18293, at *6; *see also Vanderbilt*, 174 F.R.D. at 229 (noting that "mental-state-at-issue" test, under which courts have differed as to when and under what circumstances a patient places her mental state at issue, would introduce uncertainty and eviscerate the effectiveness of the privilege).

■ Furthermore, the Court agrees with Plaintiffs that, for policy reasons, a waiver of the psychotherapist-patient privilege should not be narrowly construed, particularly in civil rights cases where Congress has placed much importance on litigants' access to the courts and the remedial nature of such suits. *See, e.g., Cabrera v. Jakabovitz*, 24 F.3d 372, 388 (2d Cir.1994) (noting that provisions of Fair Housing Act " 'are to be given broad and liberal construction' " to keep with Congress's intent of " 'replacing

racially segregated housing with 'truly integrated and balanced living patterns' ' "). Congress provided for recovery of attorney's fees in cases such as this were the plaintiff to prevail. *See* 42 U.S.C. § 3613©(2) (noting that a "court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee and costs" for violation of Fair Housing Act). The purpose of fee-shifting provision in civil rights legislation is "to ensure 'effective access to the judicial process.' " *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (citation omitted). That purpose would be defeated were the broad or uncertain test of waiver applied and suits vindicating civil rights and seeking recovery for general damages thereby deterred.

### 6. No Waiver by Plaintiffs

■ The Court concludes that, under the narrow approach to waiver applicable here, Plaintiffs have not waived the psychotherapist-patient privilege. Plaintiffs have stipulated that they will not affirmatively rely on any treating psychotherapist or other expert to prove the emotional distress damages suffered by Mr. Fitzgerald and Mr. Yu.[3] The Court notes that, even if the middle ground approach to waiver (*i.e.*, "garden-variety" emotional distress) were applied, no waiver would be found in the instant case. Plaintiffs have not pled a cause of action for intentional or negligent infliction of emotional distress[4] and have not alleged a specific psychiatric injury or disorder or unusually severe emotional distress extraordinary in light of the allegations.[5] Nor have they conceded their

3. As noted at the hearing, if Plaintiffs' friends who are psychotherapists testify as to the emotional distress they observed as to Mr. Fitzgerald or Mr. Yu, the privilege might be waived should the Court conclude that the testimony amounts to expert testimony.

4. That Plaintiffs have alleged negligence based on the same facts which underlie their federal civil rights claim does not change the outcome. The basic theory of liability and the damages alleged are the same. Moreover, under Rule 35, mere allegations of negligence alone do not expose a litigant to a medical examination.

5. In deposition, Mr. Fitzgerald and Mr. Yu described with particularity the distress they expe-

rienced which was tied directly to Defendants' alleged conduct. For example, Mr. Fitzgerald testified that: "I'm constantly checking to see if Don's [i.e., Mr. Simmons] up at his window, if Don's home, when I pass by there I find myself at times, if inappropriately, I think limiting Declan from being able to just be a kid because I'm afraid that Don will kind of have some reaction and that Declan and I will be face the one again with Don yelling at us or swearing at us or something." Cristol–Deman Decl., Ex. 1 (Fitzgerald Depo. 210:6–13).

Similarly, Mr. Yu testified that: "[I have a] [s]light increase in heart rate before I leave the house, feeling hypervigilant when I walk past Don's window, feeling my body tense up and

mental condition as revealed in the records sought is "in controversy."

## III. CONCLUSION

Because the psychotherapist-patient privilege has not been waived based on the Plaintiffs' stipulations and statements as to the scope of the testimonies and evidence to be presented at trial, the Court GRANTS Plaintiffs' motion to quash the subpoenas issued to Maggie Hochfelder, M.F.T.; Christa Donaldson, M.F.T.; Thomas Caldarola, M.F.C.C.; and California Pacific Medical Center.

IT IS SO ORDERED.

feeling myself feel more restricted internally when I'm bringing Declan home from school or taking him out, concerned that he'll start to fuss and draw attention to us. Feeling anxious, agitated, on edge, after we've been yelled at, after I was yelled at on the third, when he was in the apartment, and you know, on his business, I mean working, and you know, in this very flat as a matter of fact way saying, 'You are not planning on staying here,' you know, made my heart rate increase, and my—I felt nervous in a sense of not knowing how to respond.... [F]eeling nervous when Patrick has said, 'I am going to take Declan out to play,' taking him out with his car, I feel nervous about that, and it manifested in how do I say it, in terms of letting Patrick be his own person, and if that's what he wants to do, I might not do that, so basically trying not to control him, and say don't do that, I don't want to get into another thing with Don." *Id.*, Ex. 2 (Yu Depo. 54:10–55:8).